**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| ROBERT F. ZACHARIASIEWICZ, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )     Civil Action No._____ |
| | ) |
| MATTHEW WHITAKER, | ) |
| Acting Attorney General | )     JURY DEMAND |
| U.S. Department of Justice | ) |
| 950 Pennsylvania Avenue | ) |
| Washington, D.C. 20530, | ) |
| | ) |
| Serve: | ) |
| Matthew Whitaker | ) |
| Acting Attorney General | ) |
| U.S. Department of Justice | ) |
| 950 Pennsylvania Ave., N.W. | ) |
| Washington, D.C., 20530 | ) |
| | ) |
| G. Zachary Terwilliger | ) |
| U.S. Attorney for the Eastern District of Virginia | ) |
| Justin W. Williams U.S. Attorney's Building | ) |
| 2100 Jamieson Avenue | ) |
| Alexandria, VA 22314 | ) |
| | ) |
|     Defendants. | ) |
| _____ | ) |

## **COMPLAINT**

## **SUMMARY**

    This case involves a Drug Enforcement Administration ("DEA") Supervisory Special

Agent with an unblemished record in drug enforcement and counter-terrorism, who paid the price

in terms of career advancement, for having the temerity to speak out against a misguided and

reckless policy change instituted by then incoming Chief of Operations Anthony "Tony" Williams

and approved by then Deputy Administrator John "Jack" Riley. Williams course would have

forced all experienced Agents out of the highly vaunted Bilateral Investigations Unit ("BIU") of the Special Operations Division ("SOD") of the DEA thereby seriously and negatively affecting the strength and continuation of ongoing narco-terrorism investigations, particularly in the Southern District of New York, the epicenter of federal efforts to strike at this national security threat. Following Plaintiff's protest of that policy, which captured the ears of the former U.S. Attorney for the Southern District of New York Preet Bharara, then DEA Administrator Charles Rosenberg, in response to concerns on the negative impact the policy would have on morale and on ongoing international investigations, revoked the policy and directed Williams to personally communicate the rescission of the policy to the Agents of the Special Operations Division ("SOD"), under the watchful eye of Rosenberg's Chief of Staff, Michael Gill.

Although this reversal should have kept Plaintiff in his position as a Special Operations Division Supervisory Special Agent, where he had investigated and helped prosecute some of the most significant Latin American, Russian and other narco-terrorist organizations, Plaintiff was involuntary transferred to a lower profile position in the "field" in apparent retaliation for his high-profile objections to the Williams policy. His subsequent attempts to promote to a GS-15 level were blocked at every turn and he remains stymied in his grade to this day, despite being overwhelming qualified for a GS-15 position as an Assistant Special Agent in Charge or its equivalent.

The Agency compounded its retaliatory conduct by advising Office Heads who had openings that they should not consider Plaintiff for promotion. Plaintiff protested this obvious violation of the Merit System Principles as well.

Plaintiff persevered and attempted to rise above these roadblocks when, in June 2017, he submitted an application for Section Chief of the Latin American Section, the same geographic

area in which he was considered a subject matter expert of the Agency for multinational narco-terrorist organizations. The Office Head evaluating candidates for selection rated Plaintiff the most highly qualified candidate and put in a recommendation for selection. Although Williams concurred in writing with the recommendation, he directed the Career Board to select a less qualified, less experienced African American female for the position, thus disregarding longstanding policy and precedent.

In response to this non-selection, Plaintiff filed a mixed case appeal to the Merit Systems Protection Board on October 3, 2017, alleging whistleblower reprisal, unemployment practices, and discrimination based on race and gender.  After a tortured procedural history where the MSPB required exhaustion before the Office of Special Counsel of the whistleblower claim and rejected the EEO based claim and the unlawful employment practices claim, Plaintiff comes to this Court pursuant to the Supreme Court precedent in *Perry v. Merit Systems Protection Board*, requesting that the case be adjudicated as a single whole.  *See Perry v. Merit Sys. Prot. Bd.*, 137 S. Ct. 1975, 198 L. Ed. 2d 527 (2017).

## JURISDICTION AND VENUE

1.      This court has jurisdiction under 28 U.S.C. § 1331. Federal question jurisdiction gives district courts original jurisdiction over civil actions arising under the Constitution, laws, or treaties of the United States. Additionally, the case arises out of the actions of a federal agency as defendant and therefore jurisdiction is proper pursuant to 28 U.S.C.  § 1346.

2.      Jurisdiction is appropriate against the Department of Justice, and its component agency the Drug Enforcement Administration, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000c; and the Federal Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8)-(9). Jurisdiction is also proper under 5 U.S.C. §7702(e)(1)(B) as this is a "mixed case" complaint upon which no action has been taken for 120 days. Jurisdiction also exists because the Plaintiff

opposed an unlawful employment practice as defined under 42 U.S.C. § 2000e-3(a).

3.     Jurisdiction is also appropriate because the defendant is a federal agency pursuant to 28 U.S.C. § 1346.

4.     Venue is appropriate in the Eastern District of Virginia under 28 U.S.C. §1391 as the federal defendant is headquartered in Arlington, Virginia, the plaintiff resides in Virginia, and the majority of acts complained of under the various statutes occurred in Arlington, Virginia, where the DEA is headquartered. The Civil Rights Act of 1964 also posits venue in the place where the conduct complained of arose.

## PARTIES

5.     **Plaintiff, Robert F. Zachariasiewicz** is a Group Supervisor Special Agent (GS-14) with the DEA and resides in Aldie, Virginia.

6.     **Defendant, U.S. Department of Justice ("DOJ")** is a federal Agency who, under the Whistleblower Protection Act, 5 U.S.C. § 2302, is the properly named party for claims arising under the Act, since the DEA is a component of the DOJ.

7.     **Defendant Matthew Whitaker ("Acting AG Whitaker"),** is the Acting Attorney General of the United States and the head of the U.S. Department of Justice. He is therefore the proper party to be named and served on Mr. Zachariasiewicz's various EEO complaints.  Acting AG Whitaker is a nominal party only and is not believed to have any personal knowledge of the events at issue.  The actual discriminatory actors in this case are all employees of the DEA, described herein, which is a component of the Department of Justice.

## Procedural History and Exhaustion of Administrative Remedies

8.     After Plaintiff was informed of his non-selection for the ASAC OSL position on September 12, 2017, as described more fully below, he took the following steps to assert and defend his rights.

4

9.      On or about September 15, 2017 Plaintiff made initial contact with the DEA EEO Office to report his claim of discrimination, based on race and sex as well as retaliation and reprisal for protected activity, due to his non-selection to the SOD/OSL position (CMB 17-340).

10.      Federal personnel regulations permit parties, such as Plaintiff, to elect the forum in which to proceed, either before the MSPB, or the EEOC, but not both.  Plaintiff elected to proceed before the MSPB, as was his right, and notified the DEA EEO office of his election.

11.      On October 3, 2017, Plaintiff timely filed a mixed case appeal with the MSPB regarding his non-selection by the DEA for the GS-15 position in SOD/OSL (CMB-17-340), as well as his non-selections for the other GS-15 positions to which he applied between 2015 and 2017.

12.      Believing he was more qualified than the actual selectee, Renita Foster, and learning that the applicant was selected over him because she was an African-American female, Plaintiff brought a claim of race and sex discrimination. Additionally, Plaintiff alleged retaliation for his protesting a policy the Agency approved and attempted to implement which, on its face, violated Merit Systems Principles by limiting Plaintiff's ability to seek and be selected for promotion based on his merit.

13.      On November 14, 2017, the ALJ dismissed the appeal before the MSPB without prejudice, ruling that Plaintiff's claims of an unlawful employment policy did not fall within the parameters of MSPB law requiring that the policy violate some well adopted standard of OPM. With respect to any claim of whistleblower reprisal for protesting the perceived improper policy, the ALJ ruled that Plaintiff was required to file his whistleblower claim with the Office of Special Counsel ("OSC") and under MSPB law, the ALJ had no separate authority to address the EEO

complaint prior to a review by the OSC of Plaintiff's whistleblower complaint.[1]

14.     Plaintiff had previously filed an appeal with the OSC on November 1, 2017. However, the OSC had not determined any course of action at the time of the ALJ's ruling.

15.     Federal regulations concerning "mixed case appeals" and "mixed case claims," required the DEA to re-docket the EEO related claims from the dismissed MSPB appeal, as of the date of the dismissal, and then to commence processing of that claim under federal EEO regulations. The DEA, however, failed to commence EEO processing and persisted in that refusal despite being notified by Plaintiff on numerous occasions of the regulatory framework.

16.     Despite regulations that required the Agency to process the EEO portion of the dismissed appeal, and despite the Agency being on notice of the EEO claims, the Agency has taken no action to process the EEO claims and has done no preliminary investigation of any kind as required under 29 C.F.R. § 1614.105-108.

17.     The failure to process the claim is a form of hostile work environment under federal EEO law and thus a hostile work environment claim is now ripe. Further, on information and belief, selections that followed CMB-17-340 (the position previously complained of) were based on retaliation and reprisal for his protected activity of filing a race and sex claim. Under Supreme Court precedence, additional claims that flow out of the initial discriminatory conduct need not be filed separately, but can allow a Plaintiff to include the similar claims in a single appeal or action. This avoids a fracturing of the related claims.

18.     The remedy for such refusal under federal EEO practice is to sanction the Agency for the refusal and may include striking defenses and evidence and forcing the Agency to bear the

---

[1] Plaintiff preserves for the record the prior claims, despite their dismissal. Substantively, whether the claims were improper employment practices is not probative of the strength of Plaintiff's claims of retaliation and reprisal and the remedy for the harm done to Plaintiff, is fully encompassed by this Complaint.

cost of discovery for its refusal to conduct the federally mandated case processing and investigation required under 29 C.F.R. § 1614.101, et. seq.

19.    On December 19, 2017, Plaintiff refiled his initial mixed case appeal with the MSPB alleging that he been subject to unlawful employment practices, whistleblower reprisal and discrimination.

20.    On December 21, 2017, the ALJ issued a "Show Cause Order", asserting that a jurisdictional issue existed as to whether the whistleblower reprisal portion of the claim had been properly exhausted and questioning whether the employment practices portion of the appeal had been properly raised.

21.    On January 5, 2018, the Plaintiff sought to withdraw his appeal without prejudice, pending OSC adjudication of his whistleblower complaint.

22.    On January 30, 2018, the ALJ dismissed the appeal without prejudice, granting Plaintiff up to 180 days from that date to refile his appeal.

23.    On March 7, 2018, more than 120 days had passed since the OSC was presented Plaintiff's complaint.  Accordingly, the OSC provided Plaintiff with a notice of exhaustion and notified him of his right to file an "individual right of action" appeal to the MSPB, as it had not examined his complaint within the prescribed 120 days.

24.    Plaintiff further alleges that his non-selection for positions that followed his submission of an MSPB appeal were based on retaliation and reprisal for filing that appeal, itself, as well as whistleblower reprisal and retaliation and for those matters occurring after he raised his EEO complaint in the mixed case appeal, retaliation for assertion of protected EEO rights.

25.    Accordingly, on May 24, 2018, Plaintiff again timely refiled his appeal to the MSPB, pursuant to the Order of Dismissal without Prejudice entered by the Administrative Law

Judge ("ALJ") on January 30, 2018. The discrimination portion of the claim was timely filed, but the ALJ ruled that the failure to exhaust the OSC complaint deprived her of the jurisdictional pre-requisite to hear an appeal that's only timely component was an EEO claim.

26.    The Plaintiff included like and similar claims in his new appeal that arose after the dismissal without prejudice. Those claims were brought as evidence of retaliation and reprisal, both for his engaging in protected EEO activity and for Plaintiff filing claims before the MSPB.

27.    On November 14, 2017, the Career Board denied Plaintiff promotion to a GS-15 for the following positions: CMB-17-364, CMB-17-367 and CMB-17-368. Plaintiff applied for several additional positions (CMB-18-300 and CMB-18-301) that were either tabled and re-advertised under another number or filled in a non-competitive process and cancelled.

28.    Between December 2017 and February 2018, Plaintiff applied for eleven (11) GS-15 openings under CMB-18-308, CMB-18-315, CMB-18-316, CMB-18-317, CMB-18-321, CMB- 18-321, CMB-18-323, CMB-18-325, CMB-18-326, CMB-18-329, CMB-18-330. These included positions in DEA's Office of Special Testing; Board of Professional Conduct; Office of Diversion; Office of Professional Responsibility; Financial Operations; and Special Operations Division. Plaintiff was passed over for all positions for which he applied and was well qualified.

29.    During the course of applying and interviewing for one of these positions, CMB-18-316, Section Chief in DEA's Financial Operations, Plaintiff was told that he was the most qualified for the position.

30.    At least certain members of the Career Board were aware of Plaintiff's MSPB complaint that had been filed in October of 2017 and, on information and belief, they relied on that protected activity and the complaint that was filed with the MSPB and the OSC as a basis for refusing to select Plaintiff.

31.    The Agency challenged the Board's jurisdiction over the EEO claims and certain non-selections which had not previously been filed before the OSC, due to Plaintiff's continuous application and non-selection to ongoing positions at the Agency.  The ALJ ultimately issued a jurisdictional ruling, over Plaintiff's objection, taking jurisdiction over twenty-five (25) non-selections, but denying jurisdiction over the EEO claims or the remaining fifteen (15) selections which had not been previously raised to the OSC.

32.    In the interim, the Parties conducted written discovery and conducted numerous depositions.

33.    On November 28, 2018 Plaintiff filed a motion requesting the ALJ stay the matter, or in the alternative, dismiss without prejudice, because more than 120 days had passed since Plaintiff filed his appeal and the MSPB had not conducted a hearing or otherwise resolved the matter.

34.    On November 30, 2018, the ALJ issued an Initial Decision dismissing Plaintiff's appeal without prejudice.

35.    Accordingly, Plaintiff has exhausted his administrative remedies before the OSC, the MSPB, and the DEA's EEO office, and this mixed case claim is now ripe to be considered by this Court.

## STATEMENT OF FACTS

**I.    Plaintiff's Exemplary Career as a Special Agent with the DEA rendered him Highly Qualified for Promotion to Senior Management:**

36.    Plaintiff began his career with the DEA in January 1998, when he was hired on as a Special Agent.

37.    At the time of his hire, Plaintiff possessed a law degree from the University of Denver College of Law in December 1997. He was also a veteran, having served as an officer in

the U.S. Navy.

38.    Based on his advanced degree and military service, Plaintiff was hired as GS-9 Special Agent rather than the starting grade of a GS-7.

39.    In his first two years in the DEA, Plaintiff was rapidly promoted to Grades GS-11 and GS-12.

40.    In January 2002, Plaintiff was "early selected" for GS-13, meaning he was promoted faster than would be expected, based on the quality and depth of his work.

41.    Plaintiff served in active "Enforcement Groups", which dealt with investigating and preparing for prosecution, drug gangs and entities involved in trafficking in illegal controlled substances. Enforcement group experience is generally favored in the DEA, given that agents are involved in fulfilling the DEA's primary mission, to stem the flow of illegal drugs trafficked to the American public and to deter and destroy the ability of traffickers to enrich themselves through such sales and to engaged in the associated criminality that goes with their illegal operations.

42.    Beginning in June 2003, Plaintiff served in the Bilateral Investigations Unit in the DEA's Special Operations Division ("BIU") as a GS-13. The Unit was specifically created to address the issue of narcotics trafficking as an adjunct to and source of income for terrorist organizations. The DEA, in response to the terror attacks of September 11, 2001, sought to create a cadre of highly trained special agents, experienced in complex prosecutions, to identify, investigate and bring to justice, kingpins and narco-terrorists. The unit was specifically designed to work with national and international security and law enforcement agencies, to target traffickers wherever they resided.

43.    The BIU was and is considered an elite unit of the DEA. Many US Attorney's Offices rely on the skill sets of agents in the BIU to assist in major prosecutions of narco-terrorists,

making its efficient operation not merely an issue of effective government service, but of preserving national security.

44.    Plaintiff worked as lead agent on several of the DEA's most significant and acclaimed investigations that involved transnational and narco-terrorist criminal organizations that directly threatened United States' national security and interests. He received numerous awards for his dedication and performance and the eye of the Russian government, which banned him from further entry there, based on his national security actions.

45.    Plaintiff acted as a lead case agent in critical operations targeting major narcotics and terrorist affiliated groups; oversaw very high level informants; conducted numerous wiretaps and other surveillance; served regularly as an affiant for Title III affidavits, search warrants, and other federal orders; testified repeatedly in United States federal court as well as foreign courts of law; worked with a wide variety of state, federal and international law enforcement organizations; regularly briefed and interacted with senior officials of many U.S. and foreign law enforcement, intelligence and military agencies; and developed a highly honed set of investigatory and supervisory skills in a variety of DEA positions.

46.    Plaintiff was specially selected in 2007 to a component of the BIU that sought to target emerging narco-terrorist groups worldwide. Plaintiff became highly proficient in administering the organization and development of large scale, multi-national, multi-jurisdictional investigations involving international law enforcement and national security groups.

47.    During his career, Plaintiff has been a dedicated and outstanding DEA Special Agent.  His performance ratings are always outstanding, and his competence and knowledge is superior. Plaintiff has won numerous DEA monetary and performance awards, including the highest possible accolade: the Administrator's Award, issued by no less than by the Administrator

of the DEA itself.

48.     Plaintiff has received numerous awards from multiple United States Attorney's Offices as well as the Director's Award for Superior Performance by a Litigative Team from the Executive Office for U.S. Attorneys.  Plaintiff also won the highly coveted and rarely issued Samuel J. Heyman, Service to America Award, a testament to his skill, dedication, knowledge and belief in service to the Nation.

49.     Plaintiff was promoted to GS-14, 1811 Series, Supervisory Special Agent in July 2010, after selection by the DEA's Career Board.  Plaintiff was assigned to the Special Operations Division, Latin America and Caribbean Section, as a Staff Coordinator. Through this selection, Plaintiff was given the opportunity to fulfill an agency mandated tour in DEA Headquarters as a GS-14.

50.     He conducted his Headquarters tour in the Special Operations Division ("SOD") Latin American Section (OSL) between July 2010 and August 2013.

51.     Within three years, Plaintiff proved his value yet again when, in August 2013, he became Acting Group Supervisor of the BIU, Latin America Group. Latin America, is, of course, the primary source of large scale narcotics trafficking and the center of narco-terrorist groups that hold tight grips on the nation states in which they operate.

52.      In November 2013, Plaintiff was formally selected by the DEA to serve as the Group Supervisor of the BIU Latin America Group. While the selection involved no promotion in terms of grade, the position of a BIU domestic field enforcement Group Supervisor position, is highly sought after because it is a recognized stepping stone to senior career advancement.[2] In his

---

[2] The path from BIU to Senior Management was a clear one. There had only been two prior BIU Group Supervisors to have left the unit prior to GS Zachariasiewicz's promotion.  Brian Dodd was promoted on to the position of Section Chief in charge of the SOD Counter Narco-Terror Operations Center and Lou Milione advanced first to the position of Assistant Special Agent in Charge of the SOD BIU and then to the position of DEA Assistant Administrator over

role, Plaintiff secured numerous awards for his group and morale was high among a cadre of highly trained and experienced agents.

53.    Plaintiff's entire DEA career demonstrates that he met and continues to meet all the objective criteria relied upon in making promotion and career enhancement decisions as to his employment.

## II.    Plaintiff was encouraged by his Chain of Command to Seek Promotion to the GS-15 Level:

54.    As part of his career progression, Plaintiff sought to promote to the GS-15 level, where he would have in all likelihood served as an Assistant Special-Agent-in-Charge ("ASAC"), in a Division Office or Section Chief ("SC") of a Headquarters Unit.

55.    In 2015, Plaintiff's then supervisor Mark Hamlet ("Hamlet"), the Special Agent in Charge ("SAC") of the DEA SOD, and Plaintiff's second level Supervisor, advised Plaintiff that he believed Plaintiff had acquired the necessary skills and training to promote to the GS-15 supervisory level. Hamlet stated he would personally support the promotion within SOD and hoped Plaintiff would continue to serve in SOD when an opening arose.

56.    In July of 2015, Assistant Special-Agent-in-Charge ("ASAC") Louis J. "Lou" Milione ("ASAC Milione") of the SOD/BIU was promoted to the Senior Executive Service ("SES"), creating an eligible vacancy for Plaintiff. Milione was Plaintiff's direct supervisor, and he enthusiastically encouraged Plaintiff to replace him as ASAC, given Plaintiff's outstanding level of performance and supervisory capabilities.

57.    DEA policies and procedures require all supervisory positions to be competitively advertised.

58.    Following years of litigation under the *Seger* case and its progeny, the DEA was

---

Diversion – one of the roughly six highest positions in the Agency.

forced to come up with an objective process for evaluating and selecting supervisory agents for promotion.

59.     All agents seeking to apply for supervisory positions at the GS-14 level are required take a Special Agent Advancement Program ("SAAP") test. They are evaluated and scored by evaluations. Half of the score comes from the candidate's supervisory agents who rate the applicant's supervisory potential, and half is scored through a standardized objective test conducted by the DEA in Washington. The latter test can be conducted only by personnel who lack personal knowledge of the applicant, to avoid conflicts and favoritism. The score is listed as 70-100, with the latter being the highest possible score.

60.     Once an Agent gets his or her SAAP score, they look for supervisory openings at the GS-14 level, and after achieving a GS-14 grade, at the GS-15 grade level.

61.     Openings must be competitively advertised, to insure fairness and transparency in selections. *Seger* sought to preclude cronyism that had plagued the Agency and made it fertile ground for race and other forms of discrimination.

62.     Once a position is advertised, an Agent expresses interest by applying for the position and completing an eight-point memorandum, listing their skills in certain categories, which is then submitted for review to the Office Head who has listed the vacancy.

63.     The applicant seeking the position with the highest SAAP score, sets the "band". All applicants within 10 points of that high score, make the Best Qualified List ("BQL"). The Office Head reviews the applications that are on the BQL and creates a Memorandum that ranks the candidates as his or her first, second or third selection.

64.     The DEA Career Board then reviews the Office Head Memorandum and almost universally upholds the Office Head ranking, except in a few defined circumstances. Agents of the

same grade as the advertised position, returning from an overseas tour, generally have priority for placement, as do agents seeking a "hardship" reassignment based on unique personal or familial needs.

65.    Agents seeking a lateral assignment may also be reviewed by the Career Board, as they automatically make the BQL if they are already of the same grade as that of the position vacancy.  However, such Agents are competitively disadvantaged, as the Agency tends to promote into leadership positions from within a given office, section, or unit.

66.    The Career Board consists of several permanent members including the Deputy Administrator and the Chief of Operations for the Agency, the number two and three positions, respectively.  The Administrator does not serve on the Career Board.

67.    The Board is supplemented by a Secretary, who keeps Board minutes, and an EEO officer, to insure compliance with federal EEO law in the selection process. Additionally, there are a rotating group of Division heads who round out the Board.

68.    In theory, the Career Board is supposed to carefully evaluate candidates for selection. In reality that determination has been largely ceded to the Office Head who oversees the vacancy theory.

69.    In most instances, and in the vacancies at issue in this case, the actual selection process takes less than two minutes, and consists largely of a voice vote on the candidate selected as the number one choice by the Office Head. Exceptions occur when the number one choice of the Office Head is slated for selection to another position on vacancies being evaluated by that specific career board. In such cases the Board selects the next ranked candidate.

70.    While this practice might suggest some level of accountability and objectivity, it is seriously undermined by the machinations of the Career Board itself.

71.    The DEA and the Board neither conducts or requires interviews of candidates. The DEA and the Board do not have any written procedures governing how they may evaluate candidates, nor, what information they may rely upon in doing so. There are no limits imposed on members of the Career Board commenting on, or voting on, candidates with whom they have personal knowledge of, relationships with, or pre-existing opinions about. Matters obtained or submitted outside the Agent produced biographies and the Office Head Recommendation Memorandum can be considered. Senior members of the Career Board may impose their views of an Agent upon the selection and indeed, as they did in this case, and they may go so far as to substitute their own candidates for those ranked and recommended by the Office

72.    Allegedly, the Board is to record the minutes where they discuss candidates for selection, but this is not always done. The Board is not required to create nor does it retain notes on how the individual members evaluated a candidate, what criteria they used or how they reached their conclusions.

73.    In prior litigation, Career Board members have defended the objectivity of the process by contending they rely on the Office Heads to screen and rank candidates. They claim that for the Board to do so, it would require endless hours of evaluation that would overwhelm the Board's capacity. Lost on the DEA, is developing a system that creates an objective evaluation process for promotion that does not rely on the individual whims of the Agency's senior personnel who address promotions as a collateral duty

74.    With respect to the specific openings to which an Agent applies, the DEA normally provides a "CMB" number defining the year and specific position at issue. Such positions are required, under Agency and federal regulations, to list the duty station, grade, and experience sought, as well as to list the minimal requirements for being considered for the position.

75.     Despite a court mandated selection process and a federal statutory scheme requiring notice to potential applicants, the DEA never advertised ASAC Milione's position.

76.     Although informed by both his SAC and ASAC that he would be a natural fit for Mr. Milione's position, Plaintiff learned that the vacancy created by ASAC Milione was never advertised at all. Instead the position was filled by a lateral transfer, for reasons the Agency has yet to state or justify.

### III.    Plaintiff Makes Protected Disclosures Opposing the Failure to Competitively Advertise the Position Opening created by the Promotion of ASAC Milione.

77.     In August 2015, Plaintiff made clear to SAC Hamlet and ASAC Milione that the selection process for the vacancy created by ASAC Milione's promotion violated the Merit System Principles and federal law requiring competitive selection.

78.     In response to the complaint, Plaintiff was informed in August 2015 by ASAC Milione that he was ineligible for promotion within his own division.  This significantly decreased his opportunity for promotion because the DEA generally promotes from within an office, section, or unit.  Accordingly, by definition Plaintiff was less competitive in units outside of SOD.

79.     In August 2015 and repeatedly in the ensuing months thereafter, Plaintiff protested to ASAC Milione, SAC Hamlet and other high ranking Agency officials that this explanation only confirmed that the Agency had violated its own regulations concerning career advancement for Special Agents, as well as federal personnel regulations which involved the  right of personnel to apply for promotion as well as the necessity for open advertisement and competitive selection of federal positions. Plaintiff informed ASAC Milione that he wanted to retain counsel and challenge these violations. Plaintiff was told that that may not be in his best interest.

80.     The disclosure that the Agency failed to announce and competitively select a candidate for the Milione position was both a protected disclosure of a violation of law, rule and

regulation and an unfair employment practice under Office of Personnel Management Standards set forth at 5 C.F.R. §§ 330.101-106, which requires a vacancy announcement and sets the standards for the announcement and the manner of selection. *See* 5 C.F.R. §§ 300.102; 330.503.

**IV.    The DEA engages in Retaliation Against Plaintiff, due to his Protected Disclosures**

81.    After he made his protected disclosures of the violation of federal employment selection practices, Plaintiff was informed by ASAC George Papadopolous, on or about January 14, 2016, that the DEA was instituting a policy to involuntarily transfer Staff Coordinator employees out of its prestigious Special Operations Division. Plaintiff was a not a Staff Coordinator but rather was a Group Supervisor in a domestic field enforcement element and he was assured by ASAC Papadopolous that this policy was not applicable to him. He would ultimately be the only non-Staff Coordinator subject to involuntary transfer.

82.    This new policy was instituted at the behest of Chief of Operations Anthony Williams. Williams has failed to provide a clear explanation as to why this was necessary, but its impact would have been to decimate the experience level of agents in the SOD.

83.    Plaintiff was not a Staff Coordinator, he was a Domestic Enforcement Group Supervisor. Thus, even under the misguided efforts of Mr. Williams and his policy, Plaintiff should have been exempt from reassignment. In fact, Domestic Enforcement Group Supervisors who have previously performed a Headquarters tour of duty as a GS-14 have always been precluded from forced transfers.

84.    In the DEA, an involuntary transfer is seen as a black mark. When this is combined with a transfer to a position that the Agent has previously held, the combination of signals is that the Agent is disfavored for promotion.

85.    Under DEA's Career Progression Guide, a Special Agent at the GS-14 level is

expected to perform a single tour of duty in the Agency's Headquarters Division for three or more years to gain policy and Headquarters experience which is required to make them competitive for further advancement.

86.     As Plaintiff had already fulfilled his required Headquarters tour, a transfer back to another Headquarters position would render him significantly less competitive than his peers.

87.     To accept an unrequested reassignment back to a second Headquarters position at the same grade would be seen as a retrograde movement, indeed a *de facto* demotion, rendering Plaintiff far less competitive for promotion. Such involuntary transfers were seen by senior management as a clear signal of poor performance or conduct—a known signal to other management within the Agency, that the Agency had lost confidence in Plaintiff.

## V.   Plaintiff makes a Second Set of Protected Disclosures

88.     When Plaintiff was informed in late January 2016 that he would be involuntarily transferred back to a Headquarters position, he protested the action to senior management of the Agency, both verbally and in writing. Plaintiff was concerned that the move would negatively and permanently impact on his career and on the ongoing major investigations he was performing.

89.     The policy in question, propagated by Anthony Williams, was never explained. Even when he was deposed in the administrative phase of this case, Mr. Williams was at a loss to explain how his policy served any legitimate Agency interests.

90.     On or about February 1, 2016, in disregard of, and apparent retaliation for, his protest, Plaintiff was directed to submit a memorandum of preference, to further his involuntary transfer to another Headquarters section (out of SOD). Plaintiff was told by his then supervisor, ASAC George Papadopolous, that further objections and protest would be detrimental to Plaintiff's career. Papadopolous directed Plaintiff to "be careful or (Deputy Administrator) Riley could send

you to the border." The term is a reference to an involuntary transfer to an undesirable post, at the Mexican border, as a tool to retaliate against and deter protests.

91.     Under protest, Plaintiff submitted a memorandum of preference as ordered on February 12, 2016. In the memorandum, Plaintiff pointed out that he had already completed a tour of duty in a Headquarters assignment and was currently serving in a position as a Domestic Enforcement Group Supervisor as appointed by DEA's Career Board and therefore, he should not be subject to the transfer.

92.     After Plaintiff objected to this inclusion in a Headquarters transfer, and in apparent response to that conduct, Williams visited SOD and met with the BIU Group Supervisors, including the Plaintiff, in February 2016. During the meeting, the Group Supervisors, and most vocally the Plaintiff, detailed for Mr. Williams the negative effect that his new policy of forced rotations out of the BIU would have on the critical work regarding narco-terrorism and national security that the BIU was engaged in—most notably with the United States Attorney's Office for the Southern District of New York.

93.     Mr. Williams was unmoved.  In response to the valid objections raised by Plaintiff and in a further step to break up SOD he attempted to reclassify the BIU positions as Headquarters positions rather than field enforcement positions, with no grandfather clause. This was essentially an impossible task as the BIU engages in enforcement ("field") duties and conducts critical investigations.

94.     Indeed, the decision to reassign Plaintiff was approved by Anthony Williams himself. In response to Plaintiff's objections, Mr. Williams directed, through the chain of command, that Plaintiff select a field division position to be assigned to through a domestic preference memo and this was to include areas outside the National Capitol Region.

95.     Plaintiff advised the Agency that any transfer outside the Washington D.C. area was a hardship, which would be disruptive to the care and education of a minor child with Asperger's Syndrome, an Autism Spectrum Disorder fully recognized as a disability under the Diagnostic and Statistical Manual V. In essence then, Plaintiff made a reasonable accommodation request under the associative prong of the Rehabilitation Act of 1973.

96.     Plaintiff continued to protest the involuntary transfer. Plaintiff had been informed that the transfer and his restriction for consideration for advancement within the Special Operations Division were not specifically directed to him but was designed to apply to SOD as a whole.[3]

97.     But, as Plaintiff has determined, it appears that the "policies" were really directed largely to him as retaliation and reprisal for his protesting the non-competitive selection process and roadblocks erected to his promotion as detailed above. Plaintiff was the only person in an enforcement position to be affected by Mr. Williams policy's changes.

98.     While the Agency has a "mobility agreement," the Agency has never justified why Plaintiff needed to be reassigned. The mobility agreement does not provide a *carte blanche* for the agency to use reassignment as a retaliatory tool.

99.     The Agency cannot demonstrate or justify why it was in the best interest of the Agency to move a top performing Agent out of a unit working on international narco-terrorism cases and place him in a local unit investigating street level drug dealers.

## VI.   The USAO for the Southern District of New York voices objection to the Williams Policy as Detrimental to Ongoing Narco-Terrorism Prosecutions

100.    Mr. Williams actions directly and negatively impacted ongoing counter-terrorism investigations. It undermined morale in the BIU and appeared to be nothing more than a managerial

---

[3] Based on this, Plaintiff filed his Employment Practices claim.

effort to disrupt the camaraderie of the special agents in BIU.

101.    Mr. Williams apparently "felt" agents were staying in BIU, and SOD generally, for "too long." At deposition, he struggled to justify the policy other than to claim that all special agents were fungible and thus there should be more rotation in the Division.

102.    Mr. Williams may have had racial motivations for his conduct. SOD agents suspected that Williams thought the section was too male and too white and that he resented its prestige and independence.

103.    Mr. Williams had a checkered history on discrimination. He oversaw an office in Oakland, California that the Department of Justice itself found was permeated by racial animus against white male agents.

104.    Williams was cited for engaging in the involuntary transfer of agents, who complained of what proved to be overt racism. This was and is the same playbook used in this case.

105.    None less than the U.S. Attorney for the Southern District of New York, long considered the Department of Justice's flagship office, expressed concern over the policy and its impact on major national security investigations into narco-terrorism.

106.    United States Attorney Preet Bharara showed immediate concern regarding the negative impact that Williams' policy would have in regard to the narco-terrorism and national security work that the BIU shared with the SDNY. Bharara was personally familiar with Plaintiff's work as was his staff, who believed Plaintiff to be a superior Agent in investigating the conduct of international organizations who used narcotics trafficking to fund activities directed against the U.S. and its allies.

107.    Bharara took the unusual step of instructing his Chief of Terrorism and

International Narcotics, Brendan McGuire, to contact DEA Administrator Chuck Rosenberg's Chief of Staff, Michael Gill, to express his concerns and ask that the newly instituted policy be reconsidered.

108.    Administrator Rosenberg made plans to visit the Special Operations Division to address the widespread and negative reaction to Williams policy.  The complaints made to Rosenberg specifically included the treatment and retaliation against Plaintiff, who had been rightly vocal in protesting a policy that would impair major prosecutions, made no logical sense and would limit Plaintiff's career. In fact, SOD/BIU Group Supervisor Thomas Cindric directly contacted Administrator Rosenberg to alert him to the treatment of the BIU and specifically the Plaintiff.

**VII.    Rosenberg Reverses the Williams Policy**

109.    Administrator Rosenberg visited the Special Operations Division in August 2016 and held a "town hall" style meeting. During the meeting, numerous SOD personnel protested Williams actions.

110.    On information and belief, Rosenberg determined Williams' actions were contrary to morale, national security, relations with the various U.S. Attorney's offices and the Agency's core mission.

111.    At the administrative phase of the case, Plaintiff made repeated efforts to depose Rosenberg. The Agency objected on relevance grounds and the administrative judge, for reasons not particularly clear to Plaintiff, blocked the deposition of this central witness.

112.    Nevertheless, it is clear that Rosenberg specifically reversed the policy and chastised Williams.  He ordered Williams to personally advise Special Agents in the BIU, that his policy of reclassifying the BIU as a Headquarters post, would be reversed. Rosenberg apparently

was so concerned in ensuring his orders were carried out without obfuscation that he directed his Chief of Staff, Michael Gill, to accompany Williams and ensure his compliance with the directive to quell the Agents concerns.

**VII.    Despite the Reversal Plaintiff is Still Involuntarily Transferred to a Less Desirable Position**

113.    Despite this reversal, Plaintiff, and Plaintiff alone, was targeted for reprisal. Plaintiff was involuntary reassigned to the Washington Division Office on August 16, 2016 as a Group Supervisor. This position involves managing a task force group conducting local street level narcotics trafficking investigations in the greater Washington D.C. area and is a significant and downward departure from a supervisor in the BIU.

114.    On information and belief, Plaintiff is and was the only Domestic Enforcement Group Supervisor, from any division, to be involuntary transferred by the Agency, that was not at the time of transfer, subject to pending discipline or investigation by the Agency's Office of Professional Conduct (OPR). The intent appeared clear to the Plaintiff. The transfer carried with it a negative connotation that Plaintiff was a disciplinary issue, or at least was now disfavored for advancement.

115.    The transfer was even more suspicious given that the Administrator of the Agency, Charles Rosenberg, explicitly and forcefully reversed Williams efforts, after hearing the complaints from senior prosecutors in the Southern District of New York, who raised concerns that the policy would undermine ongoing narco-terrorism and thus had national security implications. These officials were personally aware that Plaintiff was protesting the policy and its impact.

116.    The Agency's actions in this respect constituted both retaliation for a protected disclosure and a separate act of whistleblower retaliation, as the involuntary transfer was both

retaliatory and constituted a violation of DEA policy.

IX.    **The Agency Blacklists Plaintiff in Retaliation and Reprisal, prohibiting him from Being Even Considered for Promotion**

117.    On February 23, 2016, Plaintiff sent an email to his SAC, Mark Hamlet, discussing his concerns that he had been blacklisted from further advancement. Hamlet spoke to Plaintiff and confirmed that Plaintiff was ineligible for promotion and he would not list him as a candidate for promotion due to Hamlet's own fear that he, as a Special Agent in Charge, could invoke retaliation by senior managers like Williams and John Riley, the Deputy Administrator.

118.    Believing that a per se bar on promotions was illegal, the Plaintiff nevertheless applied for four (4) GS-15 positions between November 2015 and January 2016. These included CMB-16-312, CMB-16-320, CMB-16-336, and CMB-16-353 which were all Section Chief positions in the Special Operations Division. Although very highly qualified for each of these positions, Plaintiff was not selected for any of them. In fact, he could not have been selected, given that he was precluded from being placed on an Office Head Recommendation in the first instance. Thus, while Plaintiff could technically apply for a position, he could not realistically be selected because he was blocked from being ranked as a choice for selection by the Office Head.

119.    The issue was not a comparative one. Plaintiff was *de facto* blacklisted from being identified as a candidate for recommendation on the Office Head Memorandum. Plaintiff made the BQL for each of these promotional opportunities, having a SAAP score of 90.  He was amply qualified for any of the postings, *yet due to a prohibition on him being able to promote at all, these qualifications were rendered meaningless.* At the administrative phase of the case, Plaintiff argued that a blanket prohibition on his ability to promote was an unlawful employment practice. The initial administrative judge denied this cause of action twice, arguing oddly, that a blanket denial on the ability to seek promotion was not a policy supported by the Office of Personnel

Management, thus there was no jurisdiction for the claim. The ALJ did not address that unlawful employment practices are specifically prohibited by federal statute.

120.    For each of the four SOD positions referenced above, the Office Head who would be expected to rank the applicants for Career Board selection was the same Mark Hamlet who advised Plaintiff he could not even be considered for promotion.

121.    Plaintiff made a protected disclosure to Robert Patterson, then Chief of the Office of Professional Responsibility Unit, that any DEA policy prohibiting his ability to be considered for promotion was *per se* illegal.

122.    On January 11, 2016, Plaintiff received an email from Robert Patterson that appeared to confirm that Plaintiff's position was correct.  At the time, Mr. Patterson was in charge of DEA's Office of Professional Responsibility (OPR).

123.    Yet despite Mr. Patterson's agreement with his position, he took no action to ensure that the violation was remedied by the Agency.

124.    In fact, quite the opposite occurred. After Plaintiff's specific complaint of a retaliatory and illegal employment practice, then DEA Deputy Administrator Lou Milione, who had become one of the highest ranking officials in DEA, personally instructed Plaintiff to "keep your bag shut." Mr. Milione explained that the Plaintiff had been identified at the highest levels as a troublemaker.

125.    Plaintiff then contacted a former member of DEA's Office of Chief Counsel, John Wallace, to request intervention by that section. When Plaintiff stated that the situation may require him to hire a private attorney, Wallace, rather than assuring Plaintiff that the anti-retaliation provisions of federal law protected him, warned Plaintiff that if he did so, DEA would retaliate and Plaintiff would effectively have a "bulls-eye on his back".

126.    Believing he was entitled to be judged on his merits and that his right to make lawful protests should not be an impediment, between March and June 2016, Plaintiff submitted thirteen (13) applications for open GS-15 positions advertised at DEA Headquarters. These involved CMB No.'s CMB-16-359, CMB-16-360, CMB-16-361, CMB-16-362, CMB-16-363, CMB-16-369, CMB-16-373, CMB-16- 374, CMB-16-375, CMB-16-380, CMB-16-381, CMB-16-382, and CMB-16-384.

127.    The Plaintiff made the BQL for all of these positions and was amply qualified for each and every one of them, which included positions in DEA's Office of Professional Responsibility and Financial Operations; Section Chief in the Fusion Center; Section Chief in the Regional Operations Section; Section Chief in Operations Management; and Executive Assistant in the Office of Diversion. Plaintiff was rejected for selection for all of these positions.

128.    In August of 2016, Plaintiff applied for a GS-15 position vacancy on the Board of Professional Conduct under CMB-16-309-1. Plaintiff interviewed with ASAC Chris Quaglino, the direct supervisor over the position. Mr. Quaglino told Plaintiff that he was highly qualified and undoubtedly would be placed among the top ranked candidates for selection.

129.    In an effort to avoid selection of Plaintiff who was clearly qualified, the opening was voided and then re-advertised. Plaintiff reapplied but was not chosen for the position.

130.    In September 2016, Plaintiff applied for a job vacancy for a GS-15 (ASAC) position in the Office of Congressional and Public Affairs. The vacancy was filled without using the competitive process, in violation of OPM standards for selection based on merit, after the advertisement was "rescinded." In March 2017, Plaintiff was approached by Gary Owen, Chief of Public and Congressional Affairs. Owen stated he would have chosen Plaintiff if the position had been subject to competitive selection.

131.    On November 4, 2016, Plaintiff sent an email to Mr. Patterson to congratulate him on his selection as Acting Deputy Administrator. Plaintiff had worked with and for Patterson in the New York Field Division and the two of them had a friendly relationship dating back almost two decades. Patterson caustically replied "[y]ou still have to stay at the WDO... Thanks,". The comment was made all the more biting because Patterson had initially advised Plaintiff, while Patterson headed OPR, that a per se restriction on his ability to seek promotion was improper.

132.    In January 2017, Plaintiff applied for two (2) additional positions on the Board of Professional Conduct and re-applied for the Board position that had been tabled and not selected. These three openings were carried as CMB-17-316, CMB-17-318, and CMB-17-322. Plaintiff was not selected for any of the three openings even though he was substantially more qualified than the selectees. When only one position was available, Plaintiff was rated as one of the top three candidates. When three positions were now available, Plaintiff no longer placed on the Office Head recommendation list for any of the three positions. It should further be noted that one of the persons that Plaintiff was initially rated above, has since been selected to the Board of Professional Conduct in lieu of Plaintiff. There was no change in the Office Head prior to these chain of events.

133.    Upon information and belief, Plaintiff's non-selections for these openings were based on retaliation and reprisal for his prior protected activity.

134.    Ironically, Plaintiff's non-selections continued after Robert Patterson became Acting Administrator when he replaced Charles Rosenberg in October 2017. Patterson would later testify that he felt that Plaintiff was now undesirable for a senior position, because of his negative attitude. This formed a perfect trap. Plaintiff could not promote due to reprisal, and his negative response to illegal activity now created an attitude problem.

135.    Plaintiff also applied for two (2) GS-15 promotional opportunities advertised in the

DEA Special Operations Division, CMB-17-315 and CMB-17-325. These were filed at the March and June 2017 Career Boards. Plaintiff was more qualified than the selectees, but was again passed over. Plaintiff alleges he was unlawfully denied these positions due to retaliation and reprisal for his protected whistleblowing activity.

136.    In February 2017, Plaintiff met with Special Operations Division SAC Raymond Donovan ("SAC Donovan"), who had replaced Mr. Hamlet, to discuss the apparently intentional pattern of non-selections and his opportunities for promotion under SAC Donovan. SAC Donovan told Plaintiff that at one point, Deputy Administrator Jack Riley had taken issue with the Plaintiff's actions and that the Plaintiff was now in disfavor. SAC Donovan explained that Riley was explicitly upset that then U.S. Attorney for the Southern District of New York, Preet Bharara, had attacked Williams' attempts to denigrate the experience levels in the SOD and BIU.  Mr. Riley was further upset that Mr. Bharara had expressed specific support for Plaintiff remaining in the Special Operations Division. Riley stated that this had upset and offended him and that Plaintiff was lucky he was not "on the border"—referring to an undesirable position.

X.    **A Corrupted Promotion System: The Career Board fails to serve as an Effective Check on the Reprisal inflicted on Plaintiff**

137.    During the course of discovery in the Merit System Protection Board proceedings, Plaintiff received copies of approximately twenty-nine Office Head recommendation memorandums relating to positions for which he had applied.  Nine of these memorandums had been manipulated with pen and ink changes applied by Deputy Administrator Riley and/or Chief of Operations Williams, who passed themselves off as, and voided the selections of, the Office Heads in their Recommendation Memorandums.

138.    *In every one of these nine instances, the Career Board selected for promotion the candidates that Riley and Williams substituted as their own candidates, thus directing the Career*

*Board whom to select through their actions.*

139.    The results are not surprising. The remainder of the Career Board members were subordinates of Riley and Williams, both of whom were permanent members of the Board and had a history of punishing subordinates who did not support their interests.

140.    The Career Board was developed in direct response to anti-discrimination litigation and was supposed to serve as an independent and disinterested body to make selections based on merit rather than cronyism or outright discriminatory motives.

141.    Yet, the Board has few set procedures. It need not and does not interview candidates; Board members are not recused on voting on candidates they are personally familiar with; Board members may consider materials not presented to the whole Board; Board members may discuss candidates outside the actual meetings that approve selections; Board members have no set criteria for selection; and Board members need not take notes or document who voted for which candidates and why. While some Career Board minutes are recorded, others are not. Hardly a bastion of best employment practices, the Board is a handmaiden to a selection process that is so vague and subjective as to lack all objective criteria.

142.    The reason for this appears intentional. The DEA does not want its promotion system subject to challenge, so it renders it so subjective as to try to deprive Agents of any comparators on which they can rely to prove its illusory nature.

143.    But even in this respect, with a Board unbridled by standards, Riley's and Williams' actions were improper. By altering the rankings and candidates submitted by Office Heads, and passing them off as the actions of those Office Heads, Williams and Riley reduced the Career Board to a personal fiefdom. They fraudulently altered the last remaining objective standard, the Office Head ranking and explanation of the selection of a particular candidate to fill the position.

### XI.    Plaintiff is Non-selected due to his Race and Gender

144.    In June 2017, Plaintiff applied for a GS-15 position as the Assistant Special Agent in Charge for the SOD, Caribbean and Latin American Section ("OSL"), Vacancy Announcement CMB-17-340.

145.    Consistent with DEA practice, Plaintiff provided an eight-point memorandum of his skills set and accomplishments as part of his application packet.

146.    As per DEA practice, the acquiring Office Head SAC Donovan reviewed the list of best qualified candidates and made a ranking score of his top selections.

147.    Donovan expressed a commendable independence when he refused to accept a prohibition on the Plaintiff being able to recommended for positions and ranked Plaintiff as the most highly qualified Agent for the position.

148.    Plaintiff's being ranked as SAC Donovan's top choice established that, per DEA practice itself, Plaintiff was substantially more qualified than the other candidates by virtue of the Office Head's comparison.

149.    Chief of Operations Williams signed his concurrence of Plaintiff as the top-ranked candidate on SAC Donovan's Recommendation Memo.

150.    On September 6, 2017, the Career Board met.

151.    In a flagrant departure from policy and practice, the Career Board overruled Donovan and ignored Plaintiff. Instead it selected an African American female, Renita Foster, who was less qualified in terms of experience, training and depth and breadth of case work and supervisory background.

152.    On September 12, 2017, the Career Board "minutes" were released.  Plaintiff has reviewed the recorded Career Board minutes regarding the selection of Ms. Foster.

153.    The time spent on the selection was minimal, but the minutes confirm that Anthony Williams, who is also African-American, had personally declared his support for Ms. Foster and that the Board then followed suit. At the beginning of the deliberations, Mr. Williams instructed the Career Board members to vote for Ms. Foster because she has "a lot more diversity"—code for the fact that Plaintiff, as a white male, lacked such "diversity."

154.    Subsequent conversations between Plaintiff and DEA managers appeared to confirm that race and sex were a factor in his non-selection and of course Williams' actions were the target of the prior protected disclosures of Plaintiff, rendering this non-selection a "mixed-case" issue in its own right since it involved both discrimination and whistleblower reprisal.

155.    Even if the SAC Memo was not conclusive of his superior qualifications, a simple comparison between Ms. Foster and Plaintiff would have objectively established him as the more qualified candidate. Plaintiff has far greater experience, both within SOD and internationally. Further, he has had a more varied and distinguished career than Ms. Foster and had prior experience working in the very section to which he sought promotion as a supervisor.

156.    On September 27, 2017, then DEA Acting Deputy Administrator Patterson, who chaired the Career Board selecting Ms. Foster, while serving in his role as Acting Deputy Administrator, personally informed Plaintiff that he had been rejected for a less qualified candidate based on race and/or sex (or both). Specifically, Mr. Patterson told Plaintiff that he had been "Mauricio'd;" a known term derived from Mr. Patterson's own non-selection over a less qualified minority candidate. Mr. Patterson further explained to Plaintiff that he had spoken to SAC Donovan and asked him why he placed "her" on the list if he wanted Plaintiff for the position (thus indicating that with the inclusion of a minority female on the list Plaintiff effectively stood no chance of selection).

157.    In deposition, Patterson admitted that he compared Plaintiff's non-selection with a prior instance in which he had been rejected for a position by the Career Board in favor of a Latino candidate who Patterson believed to be less qualified and who was rated below Patterson on the Office Head Recommendation Memorandum.

158.    In the Career Board minutes, at least one member seems to argue that Foster's race and sex, that is to say her "diversity," is the ultimate factor for selection.

159.    Ironically, though rated number one for this position by the Office Head, the Career Board did not subsequently place Plaintiff in a GS-15 position. It should be noted that for this position, no overseas candidate, hardship or lateral transfer issue was involved.

<u>COUNT I:</u>
<u>Race and Gender Discrimination in Violation of Title VII of the Civil Rights Act</u>

160.    Paragraphs 1 through 159 are re-alleged and incorporated as if fully set forth herein.

161.    As described above, the Agency discriminated against Plaintiff with respect to the terms and conditions of his employment, including but not limited to, compensation and selection decisions, because of his gender (male) and race (Caucasian), in violation of Title VII, by failing to promote him when he was the most qualified candidate.

162.    The Agency's conduct has been intentional, deliberate, willful, and conducted in callous disregard of the rights of Plaintiff.

163.    Title VII's anti-discrimination provision makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a).

164.    In June 2017, Plaintiff applied for the position of ASAC of the SOD, Caribbean and Latin American Section ("OSL") under CMB-17-340. The head of SOD, SAC Donovan, who

was the person most qualified to assess the strengths of all the candidates, put forward Plaintiff as his top choice to the Career Board.

165.    On September 6, 2017, the Career Board met to consider the position. The minutes from the Career Board meeting were released on September 12, 2017 and confirmed that Plaintiff was ranked number one (1) on the selection list.

166.    Plaintiff was not selected for the ASAC of the SOD, OSL position. Rather, Ms. Renita Foster, an African-American female who was significantly less qualified than Plaintiff, was selected.

167.    Plaintiff alleges that he was not selected for the ASAC position because he was a male, and/or because he was White (Caucasian), and not based on his qualifications or any other meritorious grounds.

168.    Plaintiff alleges that he was substantially more qualified than Ms. Foster to perform the duties of the ASAC of OSL position.

169.    Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discriminate against any of his employees...because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

170.    The Agency's discriminatory denial of selection for promotion against Plaintiff constitutes unlawful retaliation in violation of Title VII's anti-retaliation provision. Further, the Agency's refusal to process the claim was part of a hostile work environment designed to discourage Plaintiff and others from pursuing protected EEO activity.

171.    As a remedy, Plaintiff seeks selection to an ASAC or other GS-15 position to which

he applied, or to one for which he is now qualified. He seeks any pay differential, benefits, front pay, pain and suffering and emotional distress damages up to the statutory maximum, attorneys' fees and costs and injunctive relief requiring the Agency to fully comply with Title VII and not discriminate against males in the selection of upper level positions. Plaintiff further seeks any remedy the Court considers appropriate and just.

## COUNT II
## EEO based Retaliation and Reprisal

172.     Paragraphs 1 through 159 are re-alleged and incorporated as if fully set forth herein.

173.     As described above, Plaintiff timely asserted his EEO complaint in September 2017 after he was non-selected for the SOD/OSL ASAC position due to race and gender discrimination.

174.     Since September 2017, Plaintiff has continued to apply for GS-15 positions for which he is well qualified, and to date has applied to over fifty (50) positions without selection to any.  *See* Exhibit 1. Plaintiff alleges his continued non-selection is retaliation and reprisal for his protected activity in asserting his EEO complaint.

175.     Plaintiff asserts that his non-selection for all positions for which he has applied since September 2017 are properly brought in this action as ongoing, similar, and related claims to those asserted throughout the administrative process.

## COUNT III
## Retaliation and Reprisal in Violation of the Whistleblower Protection Act for Plaintiff's Protesting the Agency's Failure to Comply with the Competitive Selection Process

176.     Paragraphs 1 through 159 are re-alleged and incorporated as if fully set forth herein.

177.     In July 2015 ASAC Milione of the SOD/BIU was promoted to the SES, which created a vacancy for which Plaintiff was highly qualified.

178.     The Agency was required by federal personnel law, rules and regulations to competitively advertise the vacancy created by ASAC Milione's promotion. *See* 5 C.F.R. §§

330.101-106; 300.102; 330.503.

179.    The Agency did not competitively advertise the ASAC of SOD/BIU position opened by Mr. Milione's promotion.

180.    Plaintiff reasonably believed that the Agency's failure to competitively advertise ASAC Milione's position was a violation of law, rule or regulation.

181.    Plaintiff protested the Agency's failure to comply with the federal employment competitive selection process by complaining up his chain of command, including without limitation to ASAC Milione and SAC Hamlet.

182.    As a direct result of Plaintiff protesting the Agency's failure to comply with the competitive selection process, he was "blackballed" within the Agency and unlawfully denied future promotions.

183.    Since August 2015, Plaintiff has continued to apply for GS-15 positions for which he is well qualified, and to date has applied to over eighty (80) positions without selection to any. *See* Exhibit 1. Plaintiff alleges his continued non-selection is retaliation and reprisal for his protests and protected whistleblower activity.

184.    Plaintiff asserts that his non-selection for all positions for which he has applied since August 2015 are properly brought in this action as ongoing, similar, and related claims to those asserted throughout the administrative process.

## COUNT IV
### Retaliation and Reprisal in Violation of the Whistleblower Protection Act for Plaintiff's Protesting of Mr. William's Policy regarding the Special Operations Division

185.    Paragraphs 1 through 159 are re-alleged and incorporated as if fully set forth herein.

186.    On or about January 2016 Chief of Operations Anthony Williams instituted a new policy whereby Staff Coordinators would be involuntarily transferred out of the Special Operations

Division.

187.    Plaintiff reasonably believed that Mr. Williams new policy violated federal personnel law and Merit System Principles, namely 5 U.S.C. § 2302 and 5 C.F.R. § 300 et. seq.

188.    Plaintiff protested Mr. Williams policy by voicing his concerns in the open meeting at SOD and by complaining up his chain of command, including without limitation to ASAC Papadopoulos, his SAC, and the U.S. Attorney's Office for the Southern District of New York.

189.    As a direct result of Plaintiff protesting Mr. Williams policy, he was "blackballed" within the Agency and unlawfully denied future promotions in retaliation for his protests.

190.    Since January 2016, Plaintiff has continued to apply for GS-15 positions for which he is well qualified, and to date has applied to nearly eighty (80) positions without selection to any.  *See* Exhibit 1. Plaintiff alleges his continued non-selection is retaliation and reprisal for his protests and protected whistleblower activity.

191.    Plaintiff asserts that his non-selection for all positions for which he has applied since January 2016 are properly brought in this action as ongoing, similar, and related claims to those asserted throughout the administrative process.

## COUNT V
### Retaliation and Reprisal in Violation of the Whistleblower Protection Act for Plaintiff's Protesting of his involuntary transfer out of the Special Operations Division

192.    Paragraphs 1 through 159 are re-alleged and incorporated as if fully set forth herein.

193.    Notwithstanding Plaintiff's complaints and protests of Mr. Williams policy and further notwithstanding Plaintiff being exempted from the policy due to his status as a Domestic Enforcement Group Supervisor and not a Staff Coordinator, Plaintiff was nonetheless ordered to submit a domestic preference list.

194.    From February 2016 to May 2016 Plaintiff submitted a domestic preference list on

four separate occasions up his chain of command.

195.    Throughout the repeated requests from senior management for Plaintiff's domestic preference list he continued to protest his involuntary transfer and sought clarity on the application of the policy to his position, and in fact received confirmation that the policy did not apply to him.

196.    Plaintiff reasonably believed that his involuntary transfer violated federal personnel law and Merit System Principles, namely 5 U.S.C. § 2302 and 5 C.F.R. § 300 et. seq.

197.    Plaintiff protested his involuntary transfer by complaining up his chain of command, including without limitation to ASAC Papadopoulos, his SAC, and the U.S. Attorney's Office for the Southern District of New York.

198.    As a direct result of Plaintiff protesting his involuntary transfer, he was "blackballed" within the Agency and unlawfully denied future promotions in retaliation for his protests.

199.    Since February 2016, Plaintiff has continued to apply for GS-15 positions for which he is well qualified, and to date has applied to nearly eighty (80) positions without selection to any. *See* Exhibit 1. Plaintiff alleges his continued non-selection is retaliation and reprisal for his protests and protected whistleblower activity.

200.    Plaintiff asserts that his non-selection for all positions for which he has applied since February 2016 are properly brought in this action as ongoing, similar, and related claims to those asserted throughout the administrative process.

## COUNT VI
## Retaliation and Reprisal in Violation of the Whistleblower Protection Act for Plaintiff's Protesting to the Head of OPR of his being made non-competitive

201.    Paragraphs 1 through 159 are re-alleged and incorporated as if fully set forth herein.

202.    Throughout 2016 and into 2017 the Agency continued to retaliate against Plaintiff

by, among other things, ordering Office Heads not to list Plaintiff on Recommendation Memos.

203.    The Agency therefore made Plaintiff non-competitive wherein he was not even considered for positions to which he applied and was well qualified.

204.    On January 11, 2016 Plaintiff contacted Robert Patterson, who was then the Chief of the Office of Professional Responsibility Unit, in protest and notified him that any policy or practice that prohibited Plaintiff from being considered for promotion was *per se* illegal under federal employment law.

205.    Plaintiff's contact and discussion with Mr. Patterson was a protected disclosure under the Whistleblower Protection Act.

206.    Plaintiff reasonably believed that his being blackballed and being prohibited from consideration for promotion violated federal personnel law and Merit System Principles, namely 5 U.S.C. § 2302 and 5 C.F.R. § 300 et. seq.

207.    As a direct result of Plaintiff contacting Mr. Patterson and protesting his being "blackballed" and made non-competitive, the Agency unlawfully denied future promotions in retaliation for his protected disclosures.

208.    Since that time, Plaintiff has continued to apply for GS-15 positions for which he is well qualified, and to date has applied to nearly eighty (80) positions without selection to any. *See* Exhibit 1. Plaintiff alleges his continued non-selection is retaliation and reprisal for his protected disclosure.

209.    Plaintiff alleges that his non-selection for all positions for which he has applied since his protected disclosure to Mr. Patterson are properly brought in this action as ongoing, similar, and related claims to those asserted throughout the administrative process.

## COUNT VII
## Unlawful Employment Practices in Violation of OPM regulations (5 C.F.R. § 300 et. seq.)

210.    Paragraphs 1 through 159 are re-alleged and incorporated as if fully set forth herein.

211.    The Agency's change in promotion and placement policies regarding the SOD, the BIU, and specifically the Agency's policy prohibiting Plaintiff from promotion are unlawful employment practices under federal law, namely OPM's regulations promulgated at 5 C.F.R. § 300 et. seq.

212.    Plaintiff also notes that his employment practices claim was raised at the administrative level as a cognizable claim before the MSPB. *See* 5 C.F.R. § 300 et. seq. and 42 U.S.C. § 2000.

## COUNT VIII
## Prohibited Personnel Practices in Violation of 5 U.S.C. § 2302

213.    Paragraphs 1 through 159 are re-alleged and incorporated as if fully set forth herein.

214.    The Agency's change in promotion and placement policies regarding the SOD, the BIU, and specifically the Agency's policy prohibiting Plaintiff from promotion are unlawful and prohibited personnel practices under federal law, namely 5 U.S.C. § 2302.

### PRAYER FOR RELIEF

WHEREFORE, as a remedy, Plaintiff respectfully requests judgment as follows:

A.    Accept jurisdiction over this matter, in toto;

B.    Award Plaintiff selection to an ASAC or other GS-15 position to which he applied, or to one for which he is now qualified;

C.    Award Plaintiff any pay differential including back pay, front pay, and all associated benefits;

D.    Award Plaintiff compensatory damages;

E.       Award Plaintiff pain and suffering, and emotional distress damages up to the statutory maximum,

F.       Award Plaintiff all attorneys' fees and costs incurred in connection with this action and the underlying administrative actions;

G.       Award injunctive relief requiring the Agency to fully comply with Title VII and not discriminate against whites (Caucasians) or males in the selection of upper level positions.

H.       Grant Plaintiff such additional or alternative relief or remedy the Court considers appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby requests trial by jury for all claims herein.

Respectfully submitted,
Robert F. Zachariasiewicz
By Counsel

  /s/ Kevin E. Byrnes, Esq.
Kevin E. Byrnes, VSB No. 47623
Samuel M. Adelmann, VSB No. 81786
**FH+H, PLLC**
1751 Pinnacle Drive, Ste 1000
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
kbyrnes@fhhfirm.com
sadelmann@fhhfirm.com
E-file@fhhfirm.com